UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JANET M.  MERILLAT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL NO.  1:04cv193 |
| | ) |
| METAL SPINNERS, INC., | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant,

Metal Spinners, Inc ("Metal Spinners"),  on May 18, 2005.  The plaintiff, Janet M. Merillat

("Merillat"), responded to the motion on July 19, 2005.  Metal Spinners filed its reply on August

5, 2005.

For the following reasons, Metal Spinners' motion for summary judgment will be

granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary

judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to

grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving

party's position is not sufficient to successfully oppose summary judgment; "there must be

evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of

Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988);

Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986).

No genuine issue for trial exists "where the record as a whole could not lead a rational trier of

fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957

F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986)).

 Initially, Rule 56 requires the moving party to inform the court of the basis for the

motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories,

and admission on file, together with the affidavits, if any, which demonstrate the absence of a

genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the

motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings

alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th

Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline

Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

 So that the district court may readily determine whether genuine issues of material fact

exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of

Material Facts" supported by appropriate citation to the record to which the moving party

contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a

"Statement of Genuine Issues" supported by appropriate citation to the record outlining all

material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v.

American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment

motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences

in favor of the non-moving party, and does not weigh the evidence or the credibility of

witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the

motion for summary judgment, the court will assume that the facts as claimed and supported by

admissible evidence by the moving party are admitted to exist without controversy, except to the

extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to

the motion.  L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the

outcome of the suit under the governing law.  Anderson, 477 U.S. at 248.  Irrelevant or unneces-

sary facts do not preclude summary judgment even when they are in dispute.  Id.  The issue of

fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the

material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities

Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with

specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment

determination is essentially an inquiry as to "whether the evidence presents a sufficient disagree-

ment to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." <u>Anderson</u>, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  <u>Mason v. Continental Illinois Nat'l Bank</u>, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Merillat is a 49 year old female who worked for Metal Spinners from 1983 through June 3, 2003.  Merillat's job title was Purchase Manager until December of 2002.  From December of 2002 until her termination, Merillat had the job title of Senior Buyer.  Merillat's job duties as a Purchase Manager included complying with company policies; managing the purchase procurement of metals and materials, supplies, small tools, and hand tools; accounting for the previously mentioned items; issuing materials to production jobs; safe-guarding and accounting for inventory; managing the effectiveness of suppliers; overseeing the day–to-day activities as needed; managing and supervising various administrative assistants and associates; and representing Metal Spinners in a professional manner.

Olin Wiland ("Wiland") is the CEO of Metal Spinners. Wiland made the final determination to terminate Merillat. Wiland claims that he terminated Merillat because Metal Spinners was experiencing an economic downturn and Merillat's termination was a result of a reduction in force ("RIF").  In addition, Wiland states that he based his decision to terminate Merillat on the fact that he felt that her duties could be absorbed by other employees or a computer program, Vantage Computer System ("Vantage"). In addition to Merillat, the Vice President of Sales and Marketing, Patrick O'Beirne, was also terminated. O'Beirne is a male, who was under age 40 at the time of his termination.

4

In December 2002, approximately six months prior to Merillat's termination, Craig Wehr ("Wehr"), a male (age 38) was hired as the Vice President of Procurement and Materials Management. Wehr's jobs duties included establishing strategic relationships with metal suppliers and subsequent outside processing suppliers; supervising the day-to-day material requirements and activities of the department and employees; evaluating and documenting supplier ratings and criteria for delivery, quality, and pricing; and any other duties as assigned by Wiland. After Wehr was hired,  Merillat had the job title of Senior Buyer and many of her managerial duties were given to Wehr.  Wehr had a base salary of $65,000 while Merillat's salary was $49,800. Wehr also acted as Merillat's supervisor during the six months that they worked together. Metal Spinners did not subsequently hire anyone to the position of Purchasing Manager or Senior Buyer.  Merillat's former job duties are now being performed by the Vantage program or other employees, including Wehr.

 Merillat has sued Metal Spinners under the Age Discrimination in Employment Act ("ADEA"), alleging age discrimination, Title VII of the 1964 Civil Rights Act ("Title VII"), alleging gender discrimination and the Equal Pay Act, 29 U.S.C§ 206(d) ("EPA"), alleging unequal pay based on gender.

With respect to her ADEA claim, Merillat claims that she was terminated from employment at Metal Spinners because of her age; she was 49 years-old at the time of her termination.  The ADEA prohibits an employer from "discharg[ing] any individual ... because of such individual's age."  Schuster v. Lucent Technologies, Inc. 327 F.3d 569, 573 (Ill.2003) (citing 29 U.S.C. § 623(a)(1) (2003)). To establish a claim under the ADEA, a plaintiff-employee must show that age actually motivated the employer's decision and influenced the

outcome. Id. (Citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The claim may be proven through direct evidence of the employer's discriminatory motive, or through the indirect approach articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To survive a motion for summary judgment, a plaintiff under ADEA does not need direct evidence, but need only raise an inference of discrimination. Karitotis v. Navistar International Transportation Corp., 131 F.3d 672, 676 (7th Cir. 1997).  Here, Merillat does not present any direct proof that Metal Spinner's decision to terminate her position was based on age discrimination, therefore the facts must be analyzed using the McDonnell Douglas burden shifting test.  In order to establish a prima facie case of age discrimination under this test, Merillat must prove she was (1) in a protected class (over the age of 40); (2) performing her job to her employer's reasonable expectations; (3) suffered an adverse employment action; and (4) that other substantially younger employees were treated more favorably than she was. Bennington v. Caterpillar, Inc., 275 F, 3d 654, 659 (7th Cir. 2001).

The analysis is slightly different in a RIF case, including a mini-RIF, such as this case, where only a small number of employees were terminated. When analyzing an age discrimination case under a mini-RIF, instead of proving the fourth requirement that a person outside the protected class was treated more favorably, the plaintiff must instead prove that her duties were absorbed by persons who were not in the protected class. Verwey v. Illinois College of Optometry, 43 Fed.Appx. 996, 999 (Ill. 2002).

In the present case, it is undisputed that Merillat was 49 years old at the time of her termination and that Metal Spinners terminated her employment.  However, Metal Spinners

contends that Merillat cannot prove the second and fourth elements of her prima facie case -- that she was meeting Metal Spinners' legitimate expectations or that younger employees were treated more favorably.

With respect to the "meeting legitimate expectations" element, Wiland, Metal Spinners' Chief Executive Officer, testified that Merillat failed to meet his expectations because she was unable "to entertain strategic concepts and manage new projects," because she was unable to adequately supervise subordinates, because she was not willing "to accept new challenges," because she did not get along well with her co-workers, and because she was unwilling to implement a corporate-wide computer system. (Wiland Dep. at 16-17).

Metal Spinners claims that Merillat's contemporaneous performance evaluations confirm Wiland's testimony. Merillat's evaluation for the year 2000 suggests that she needs improvement working with others because of her "confrontational and demeaning attitude toward suppliers and coworkers". (Merillat Dep. Ex. G.) Merillat's 2000 review also demonstrates that she often "let clerical tasks impair her primary responsibilities." (Merillat Dep. Ex. G.). Finally, her 2000 review notes that she had expressed displeasure with management's decisions to implement new software programs. (Merillat Dep. Ex. G.).

For the calendar year 2001, Merillat's review indicates that while she made improvements in the area of teamwork, she still had plenty of room for improvement in this area. (Merillat Dep. Ex. F.). In fact, Merillat's 2001 review indicates that she needed to "explore alternatives to her current methods and practices" to improve efficiency and profitability. (Merillat Dep. Ex. F.). The review further indicates that Merillat would be closely scrutinized in 2002 because her department had significant goals that had to be realized in order to be

successful.  (Merillat Dep.  Ex.  F.).

Merillat's review for the calendar year 2002 indicates that while Merillat met some of her goals, such as reducing raw-materials inventory, Merillat still needed to be more efficient. (Merillat Dep.  Ex.  E.).  In fact, Merillat's 2002 review indicates that "she had too many redundant/duplicate business practices that must be challenged (e.g. Al-Net and certain Excel spreadsheets)" and that these practices must be eliminated.  (Merillat Dep.  Ex.  E.). Furthermore, Merillat's 2002 review indicated that she needs continuing improvement with building rapport with co-workers and improving her demeanor.  (Merillat Dep.  Ex.  E.).

Metal Spinners argues that Merillat's reviews all comport with Wiland's testimony that Merillat was not meeting his expectations because she refused to make required changes and eliminate redundant practices.  Metal Spinners also claims that Merillat's own testimony confirms the comments on the review.  Merillat admitted that she had difficulties with co-workers and suppliers.  (Merillat Dep.  at 59).  Merillat also admitted that she did not agree with Wiland's decisions about relationships with suppliers and that certain of her practices were redundant.  (Merillat Dep.  at 40, 44, 60).  Metal Spinners concludes that Merillat's resistance to change during its troubled times was unacceptable and thus Merillat cannot establish that she was meeting legitimate expectations.

In response, Merillat points out that in her evaluations in 2001 and 2002, Wiland scored Merillat as "3" (on a scale of 1 to 5), which correlated with "Satisfactory/Good; consistently meets requirements and expectations".   Further, Merillat states that Wiland's comments on the evaluations were communicated to her as "goals to strive for" and not as areas of failure. (Merillat Aff.  at ¶ 21).

Metal Spinners concedes that the numerical ratings on Merillat's reviews for 2001 and 2002 indicates that she was performing satisfactorily, but contends that the comments on Merillat's reviews for these years indicate that Merillat was performing marginally at best. Metal Spinners argues that when a company is faced with having to reduce its number of employees, the company's legitimate expectations change somewhat because the company must attempt to do the same amount of work with less people. Therefore, an employee whose performance is marginal and whose job functions can be easily absorbed by others or performed by a computer may be a good candidate for termination.

Looking at the record as a whole, the court finds that Merillat has failed to raise an inference that she was performing her job satisfactorily in the context of a reduction in force. If Merillat had simply been fired from her job in the absence of a RIF, then she might have been able to argue that she was performing satisfactorily enough to not warrant being fired. But in this case she was not terminated for cause, but terminated due to reduction in force. This court agrees with Metal Spinners that what constitutes "satisfactory" work shifts a bit in a reduction in force case. Thus, while the record shows that Merillat was performing in the mid-range in some respects, the reviews also show that Merillat had some problems that concerned Metal Spinners enough that they were included in her evaluations. Thus, in this regard, the record supports Metal Spinners view that Merillat was a non-satisfactory performer.

Metal Spinners next claims that Merillat also cannot establish the fourth element of her prima facie case -- that similarly situated, younger employees were treated more favorably. Metal Spinners points out that as part of the reduction in force, Patrick O'Beirne, Metal Spinners' Vice President of Sales and Marketing, was also terminated, and his position was

9

eliminated.  O'Beirne is a male, who was under the age of 40 at the time of his termination.

Metal Spinners concludes that of the two office positions eliminated during the reduction in

force, one employee was under 40 and the other over 40, and thus there is no evidence that any

younger employees were treated more favorably than Merillat.

Merillat does not discuss O'Beirne in her response but, rather, takes the position that she

and Wehr are similarly situated and that Wehr was treated more favorably.  However, as Metal

Spinners makes clear, Wehr and Merillat are not similarly situated.  First, Wehr was Merillat's

supervisor.  Second, Wehr had more education and broader experience than Merillat, and the

record shows that Wiland considered these factors in making his decision about which positions

should be eliminated.  Additionally, Merillat had a history of job performance problems,

including an inability to get along with co-workers and resistance to change.

The Seventh Circuit Court of Appeals has admonished plaintiffs that they have a high

hurdle to jump in order to demonstrate that other employees are similarly situated.  "[A] plaintiff

must show that there is someone who is directly comparable to her in all material respects."

Patterson v.  Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir.  2002).  In making this

determination, courts look at a number of factors.  In certain cases, it is relevant " 'whether the

employees had comparable experience, education and qualifications,' provided that the employer

took these factors into account when making the personnel decision in question."  Id.  Courts

have also considered employees' previous job performance problems in determining whether

employees are similarly situated.  See Radue v.  Kimberly-Clark Corp., 219 F.3d 612, 618-19

(7th Cir.  2000).

This court agrees that Merillat has failed to show that she was similarly situated to Wehr

and that Merillat has failed to make any showing that a similarly situated person was treated more favorably.  Thus Merillat has failed to establish a <u>prima facie</u> case.

Even if Merillat could establish a <u>prima facie</u> case of age discrimination, the burden would shift to  Metal Spinners to show a legitimate, non-discriminatory reason for the adverse employment action. <u>Conteras v. Suncast Corp.</u>, 275 F.3d 756, 760 (7th Cir. 2001).  If Metal Spinners meets this burden, then the burden shifts back to Merillat to prove by a preponderance of the evidence that Metal Spinners' reason is merely pretext for discrimination. *Id.*

A plaintiff can prove pretext either by presenting direct evidence that a discriminatory reason motivated the employer's decision or by presenting evidence that the employer's proffered reason is unworthy of credence, thus raising the inference that the real reason is discriminatory. <u>Essex v. United Parcel Service, Inc.</u> , 111 F.3d 1304, 1310 (7th Cir. 1997). The standard requires that the employer not merely be mistaken in its judgment, but inquires whether the employer honestly believed its proffered reason for the discharge. Id.

In the present case, Metal Spinners claims that it terminated Merillat's position because it was experiencing an economic downturn, which is a legitimate, non-discriminatory reason for discrimination.  The record shows that Metal Spinners had experienced operating losses during the last half of 2002 and the first half of 2003.  In order to improve the bottom line, Metal Spinners determined that it needed to make some significant changes, including some restructuring to help reduce costs.  After deciding that it needed to make some cutbacks, Metal Spinners reviewed the company structure to determine which positions could be eliminated. (Wiland Dep.  at 93-94).  According to Metal Spinners, Merillat was chosen in part because many of her duties could be eliminated with the implementation of the company-wide Vantage

11

computer system.  Metal Spinners also points out that Wiland determined that Merillat was not meeting his expectations because of her unwillingness to implement the company-wide Vantage system and her inability to entertain strategic concepts.  Merillat also had a history of disagreements with her co-workers, and when deciding whom to terminate, Wiland considered Merillat's continued inability to take on supervisory roles and her inability to get along with co-workers.  (Wiland Dep.  at 93).  It is clear that these are all legitimate, non-discriminatory reasons for Merillat's discharge.

The burden then shifts back to Merillat to prove that these stated reasons were pretext for discrimination. Pretext may be proven "directly with evidence that [an] employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." Schuster v. Lucent Technologies, Inc. 327 F.3d 569, 574 (citing Wade v. Lerner New York, Inc., 243 F.3d at 323 (7th Cir.2001) (quotation omitted)). A plaintiff-employee may proceed indirectly by attempting to show that the employer's "ostensible justification is unworthy of credence" through evidence "tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." Schuster v. Lucent Technologies, Inc. 327 F.3d at 575 (citing Testerman v. EDS Tech. Prods. Corp., 98 F.3d 297, 303 (7th Cir.1996) (quotations omitted)).

To avoid summary judgment, a plaintiff must do more than allege that the defendant is lying about its real reasons for termination.  The plaintiff must point to specific facts sufficient to cast doubt on the defendant's proffered reasons.  See Schuster v.  Lucent Tech., Inc., 327 F.3d 569, 578 (7th Cir.  2003).  Courts are to examine "whether the employer gave an honest

explanation of its behavior.  In other words, if [the defendant] honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless, [the plaintiff] cannot prevail."  Jackson v.  E.J. Brach Corp., 176 F.3d 971, 984 (7th Cir. 1999)(internal quotations and citations omitted).  Furthermore, a plaintiff must present facts "to rebut each and every legitimate, non-discriminatory reason advanced by the [defendant] in order to survive summary judgment."  Clay v.  Holy Cross Hosp., 253 F.3d 1000, 1007 (7th Cir.  2001). In cases where the plaintiff was eliminated as part of a reduction in force, the plaintiff may demonstrate pretext in two ways: (1) showing that the entire reduction in force was pretext for discrimination or (2) showing that the reasons for including the plaintiff in the reduction were pretext.  See Paluck v.  Gooding Rubber Co., 221 F.3d 1003, 1012-13 (7th Cir.  2000).

Metal Spinners argues that Merillat cannot establish that its economically motivated reduction in force was merely pretext for age discrimination.  First, Metal Spinners' financial information conclusively proves that Metal Spinners was experiencing a net loss during the first two calendar quarters of 2003.  Merillat has not made any showing whatsoever that these numbers are pretext.  Furthermore, the other person that was eliminated as part of the reduction in force was O'Beirne, who was under age 40.

As Metal Spinners notes, because Merillat cannot prove that the reduction in force was pretext for discrimination, she must demonstrate that Metal Spinners' reasons for including her in the reduction in force were pretext.  Metal Spinners states that it chose to eliminate Merillat's position for three reasons: (1) Wehr had more desirable skills, education, and experience than Merillat and was more willing to implement new strategies; (2) many of Merillat's duties could be eliminated by the implementation of the Vantage system; and (3) Merillat had a history of

13

difficulties in working with co-workers.  Metal Spinners states that it chose to keep Wehr and eliminate Merillat because Wiland believed that Wehr had better potential to fulfill the new strategic goals of the company, including strategic relationships with suppliers.  Merillat even admitted that she thought Wehr was hired primarily to engage in strategic planning.  (Merillat Dep.  at 63).  Furthermore, Merillat had been very resistant to making the changes that Wiland felt were necessary for Metal Spinners' success.  In fact, Merillat testified that she thought Wiland's insistence on changing the relationships with suppliers was "not the right way to go".  (Merillat Dep.  at 41).  Merillat was also resistant to switching to the Vantage system.  Instead, she continued to do redundant data entry into two software programs in order to get reports that she wanted to assist her with her purchasing duties.  (Merillat Dep.  at 57-62).  When Merillat was terminated, many of her duties were eliminated by the Vantage compute system.  (Wehr Dep.  at 43-65).  According to Metal Spinners, many spreadsheets and reports that Merillat created manually were done by inputting all the raw data into Vantage and designing a report to tabulate the raw data in a user-friendly format.  Wehr began this process in August 2003, thus eliminating the need for the redundancies created by Merillat.  Finally, Merillat had a history of being difficult with other employees.  In fact, Merillat admitted that she was brusque with others and that she sometimes got overly excited and upset.  (Merillat Dep.  at 59).  Moreover, in her annual performance reviews, Wiland noted that she needed to improve in this area, and even when she demonstrated improvement, he noted that there was more room for improvement in this area.  (Merillat Dep.  Exs.  E, F, and G).

In response to Metal Spinners' arguments and evidence, Merillat merely argues that Wiland's decision was incorrect.  Merillat compares the performance of the metals department

under her supervision with the performance of the metals department under Wehr's supervision, and concludes that Wehr did a poor job and cost the company money.  However, as Metal Spinners notes in reply, these comparisons are all irrelevant and do not prove that Wiland's decision was discriminatory.  At most, they suggest that Wiland's decision may have been erroneous.  The law is clear that Wiland's decision need not be the best decision, and it need not turn out to be correct.  Courts only examine "whether the employer gave an honest explanation of its behavior.  In other words, if [Wiland] honestly believed in the nondiscriminatory reasons [he] offered, even if the reasons are foolish or trivial or even baseless, [Merillat] cannot prevail." Jackson v.  E.J. Brach Corp., 176 F.3d 971, 984 (7th Cir.  1999)(internal quotations and citations omitted).  Courts do not sit as super-personnel departments and are not to second-guess the decisions of employers.  See Giannopoulos v.  Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.  1997).

This court agrees with Metal Spinners that by focusing on the wrong legal standard, Merillat has failed to demonstrate that Metal Spinners' legitimate, non-discriminatory reasons are pretext.  As noted, in order to prove pretext, a plaintiff must present facts "to rebut each and every legitimate, non-discriminatory reason advanced by the [defendant] in order to survive summary judgment." Clay v.  Holy Cross Hosp., 253 F.3d 1000, 1007 (7th Cir.  2001). Accordingly, Merillat's ADEA claim fails for this additional reason.

Metal Spinners next argues that Merillat cannot prove her gender discrimination claim.  It is clear that Merillat does not have any direct evidence of gender discrimination.  Merillat admitted that Wiland never made any comments about her gender.  (Merillat Dep.  at 81).  At most, Merillat claims that Wiland made her remove a cartoon that she had pinned to her bulletin

15

board.  The cartoon depicted two babies -- one female and one male -- looking into their diapers, and the cartoon stated, "Oh, so this is the difference in our salaries."  Merillat claims that Wiland asked her to remove this cartoon from her workstation at approximately the time Wehr was hired.  This court agrees with Metal Spinners that although Wiland was the decision-maker with respect to Merillat's termination, this single event can hardly be evidence of gender discrimination.  As Metal Spinners notes, Wiland had a duty to ensure that the workplace remained free from hostile or discriminatory remarks.  Thus, asking an employee to remove a cartoon, which could be construed as hostile towards men, can hardly evidence gender discrimination.  Furthermore, the incident occurred at least six months prior to the decision to terminate Merillat.  There is simply no temporal connection between the incident and Wiland's decision to terminate Merillat.

Metal Spinners next argues that Merillat cannot establish a prima facie case of gender discrimination.  As with a claim of age discrimination, the prima facie case is altered slightly for plaintiffs who were terminated as part of a reduction in force, and a gender-discrimination plaintiff must establish: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she was discharged; and (4) similarly situated male employees were treated more favorably.  Michas v.  Health Cost Controls of Ill., Inc., 209 F.3d 687, 693 (7th Cir.  2000).  Metal Spinners concedes that Merillat is a woman and that Metal Spinners terminated her employment.  However, Metal Spinners claims that Merillat cannot establish the second and fourth element of her prima facie case -- that she was meeting Metal Spinners' legitimate expectations or that similarly situated men were treated more favorably.

As discussed above, Merillat was not meeting the legitimate expectations of Metal

Spinners. (Wiland Dep. at 16-17). Additionally, Merillat cannot establish that similarly situated men were treated more favorably. Although Merillat contends that Wehr was similarly situated to her, this simply is not the case. Wehr served as Merillat's supervisor while Wehr reported directly to Wiland. Furthermore, Wehr had duties other than the basic purchasing duties performed by Merillat. For example, Wehr was responsible for making strategic changes to the department, including establishing new strategic relationships with suppliers. Moreover, as part of a reduction in force, O'Beirne's job was also eliminated. Thus, it is clear that Merillat cannot point to any similarly situated men who were treated more favorably than she was treated. In any event, as set forth above, even if Merillat could establish a prima facie case of gender discrimination, Metal Spinners has articulated legitimate, non-discriminatory reasons for Merillat's termination, and Merillat cannot establish that such reasons were pretext. Accordingly, summary judgment will be granted in favor of Metal Spinners on Merillat's Title VII claim.

The court will next turn to Merillat's claim that she was paid less than Wehr because of her gender. In order to establish a prima facie case of wage discrimination under the EPA, Merillat must prove: (1) she was paid less than a male employee; (2) for equal work requiring substantially similar skill, effort, and responsibilities, and (3) the work was performed under similar working conditions. Cullen v. Indiana Univ. Bd. of Tr., 338 F.3d 693, 698 (7th Cir. 2003). Assuming that Merillat could meet this burden, the burden then shifts to Metal Spinners to show that the pay differential arises from a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or any other factor other than gender. Wollenburg v. Comtech Mfg. Co., 201 F.3d 973, 976 (7th Cir. 2000).

17

Metal Spinners acknowledges that it is undisputed that Merillat was paid less than Wehr, and that their work was performed under similar working conditions.  However, Metal Spinners argues that Merillat cannot establish that she did equal work or that her work required substantially similar skill, effort, and responsibility.  "In determining whether two jobs are equal, the crucial inquiry is 'whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical.'  Once the plaintiff establishes a common core, the court must ask whether any additional tasks make the jobs 'substantially different'".  <u>Cullen</u>, 338 F.3d at 698 (internal citations omitted).

Metal Spinners acknowledges that Wehr and Merillat did perform a number of similar tasks, including most of the purchasing department duties.  However, Metal Spinners argues that two facts differentiate Wehr's job from Merillat's job.  First, Wehr was charged with much more management responsibility than Merillat.  In fact, states Metal Spinners, that was the exact reason that Wehr was hired -- to perform management duties that Merillat was reluctant or unable to tackle.  Metal Spinners argues that these duties are "additional tasks" making Wehr's job "substantially different" from Merillat's job.  <u>Id</u>.  More specifically, Wehr was the supervisor of the purchasing department, and all employees, including Merillat, reported to Wehr.  Second, Wehr played a vital role in changing Metal Spinners' supplier relationships.  As such, Wehr was charged with creating strategic relationships with suppliers in an effort to reduce the cost of metals and reduce the amount of inventory or working capital invested into the metals.

The EPA requires courts to examine three separate elements when comparing jobs: skill, effort, and responsibility.  "Each of these elements must be met individually to establish a prima facie case."  <u>Cullen</u>, 338 F.3d at 698.  Under the EPA, skill includes factors such as "experience,

training, education, and ability."  Id.  At this point, however, courts look not at the individuals, but at the positions.  In this case, Wehr's position as Vice President of Procurement and Materials Management required more ability than Merillat's position as Senior Buyer because Wehr was required to supervise the department and to implement new strategies to improve supplier relationships.  Id.

The court must then look at whether the positions required equal effort.  "Job factors which cause mental fatigue and stress . . . are to be considered in determining the effort required by the job."  29 C.F.R. § 1620.16(a).  In this case, Wehr's position as Vice President of Procurement and Materials Management required more effort.  Although Wehr and Merillat were both office employees, Wehr's additional responsibilities and the ultimate responsibility for the materials department created more stress.  Finally, the court must consider whether Wehr's position and Merillat's position have equal responsibility.  "Responsibility is concerned with the degree of accountability required in the performance of the job."  29 C.F.R. § 1620.17(a).  The record shows that when Wehr was hired as the Vice President of Procurement and Materials Management, he was charged with supervisory responsibility for the entire department, including Merillat.  As the Vice President, Wehr had ultimate responsibility for the success or failure of the department.  Because Merillat has not established that she did equal work which required equal skill, effort, or responsibility, Merillat cannot establish a prima facie case under the Equal Pay Act.

Even if Merillat could establish a prima facie case, that would not be the end of the issue.  Rather, if a plaintiff establishes a prima facie case under the EPA, the burden then shifts to the defendant to prove that the pay disparity arises from a seniority system, a merit system, a system

that measures earnings by production, or any factor other than gender.  <u>Wollenburg</u>, 201 F.3d at

976.  Metal Spinners sets forth three reasons for the pay disparity between Merillat and Wehr:

Wehr's experience, Wehr's education, and market forces.

"Even if a man and woman are doing the same work for different pay, there is no

violation if the wage difference stems from a factor other than sex.  Experience is a

nondiscriminatory reason for wage disparity."  <u>Id</u>.  Prior to joining Metal Spinners, Merillat

worked as a legal secretary.  (Merillat Dep.  Ex.  A.).  When she was hired at Metal Spinners in

1983, Merillat was hired in the purchasing department although she had no prior experience in

purchasing.  Wehr began his career in purchasing in 1988.  Although Wehr had fewer total years

of experience than Merillat in purchasing, Wehr had a wider variety of experiences, requiring

more skill and responsibility.  For example, Wehr had previously been the supervisor of at least

two purchasing departments with several individuals reporting directly to him.  (Wehr Dep.  at

94-95).  Wehr also had experience implementing new computer systems in the purchasing area.

(Wehr Dep.  at 94-95).  Wehr also had experience in a number of different metal industries,

allowing him to compare and explore new methods within the metal-spinning industry.  Thus,

argues Metal Spinners, Wehr's experience was more significant in that he had many years of

supervisory responsibility and had experience with implementation of new materials and

purchasing software.

Metal Spinners also states that it paid Wehr more than Merillat because he had more

education, and education is "a relevant consideration in determining whether disparate salaries

exist for reasons other than sex."  <u>Cullen</u>, 338 F.3d at 702.  Merillat's education consisted of an

associate's degree in the form of a "legal secretarial degree," which she earned from the

Columbus Business University in 1972.  (Merillat Dep.  Ex.  A).  Merillat also took three courses at IPFW in the 1980s, two in purchasing and one in supervision.  (Merillat Dep.  at 14).  Wehr, in contrast, had a bachelor's degree in business administration from Indiana University.  Metal Spinners claims that Wehr's degree is clearly relevant to his job as Vice President of Procurement and Materials Management in that it gives him an overall familiarity with accounting, financial forecasting, and other factors relevant to purchasing raw materials.

Lastly, Metal Spinners argues that the pay disparity between Wehr and Merillat is justified by the market forces that existed when Wehr was hired.  Id.  When Wiland decided to create the position of Vice President of Procurement and Materials Management, he enlisted the help fo a search firm.  The firm told Wiland that the going rate for such a position was approximately $65,000 - $75,000.  (Wiland Aff.  at ¶ 9).  Furthermore, Wiland consulted trade journals to seek guidance in setting a salary for the new position, which indicated that Wehr's starting salary was at the lower end of the scale for similar positions.  (Wiland Aff.  at ¶ 9).  Metal Spinners contends that relying on these factors is permissible, and they demonstrate that Wiland had legitimate, non-discriminatory reasons for paying Wehr more than Merillat.

Merillat's response is fatally weak.  Merillat merely cites to her own testimony, where she asserts that she and Wehr performed a common core of tasks.  Merillat fails to address the issue of whether Wehr performed any additional tasks that made his job substantially different from her job.  Cullen v.  Indiana Univ.  Bd.  of Tr., 338 F.3d 693, 698 (7th Cir.  2003)(courts must first determine whether jobs have a common core of tasks and then determine if any additional tasks make the jobs substantially different).  In the present case,  Metal Spinners has documented that Wehr performed additional tasks which made his job substantially different

from Merillat's job.  Additionally, Metal Spinners has documented three reasons for the pay disparity between Merillat and Wehr: Wehr's experience, Wehr's education, and market forces. Consequently, as Metal Spinners has articulated legitimate reasons (other than gender) for the pay disparity, Merillat's EPA claim fails as a matter of law.

<u>Conclusion</u>

Based on the foregoing, Metal Spinners' motion for summary judgment is hereby GRANTED.

 Entered: September 19, 2005.

<u>s/ William C.  Lee    </u>
William C. Lee, Judge
United States District Court
